**COMMONWEALTH of Kentucky,
REVENUE CABINET,
Petitioner,**

v.

**KENINGTON SALES, INC., Respondent.**

**No. 91–CA–000733–MR.**

Court of Appeals of Kentucky.

May 22, 1992.

As Modified on Denial of Rehearing
Aug. 28, 1992.

Donald S. Guier, Arnold C. Jones, Enforcement Legal Section, Frankfort, for petitioner.

James H. Newberry, Jr., Willis L. Wilson, Jane E. Mitchell, Newberry, Hargrove & Rambicure, Lexington, for respondent.

Before HOWERTON, HUDDLESTON and MILLER, JJ.

HUDDLESTON, Judge.

Kentucky's Revenue Cabinet appeals a summary judgment granted by Franklin Circuit Court to Kenington Sales, Inc. The judgment was based on the Revenue Cabinet's failure to comply with statutory procedure in assessing sales taxes alleged to be due as the result of the sale of thoroughbred yearlings. We affirm.

In the late 1970's and early 1980's, Kenington served as one of Kentucky's major thoroughbred auction companies. Kenington was a wholly-owned subsidiary of the Kentucky Horse Center (hereinafter "KHC") which owned the facility in which Kenington conducted its sales. One Joe Johnson served as president of both compa-

nies. KHC's real estate, including the auction facility, was acquired by Spendthrift Farms, Inc., in 1984, and Kenington, without a sales facility, terminated its auction business. Having virtually no assets, KHC remained dormant.

Upon encountering financial difficulties in 1987, Spendthrift transferred the real estate formerly owned by KHC to Kenington in satisfaction of a loan which KHC had made to Spendthrift to finance its acquisition of the property. Kenington transferred the real estate back to KHC in 1988. Finally, on June 29, 1989, a group of investors acquired a controlling interest in KHC. Johnson thereupon left the employ of KHC–Kenington. Kenington has not resumed its auction business.

In 1987, the Revenue Cabinet initiated an audit of Kenington, covering the period July, 1982, through May 1, 1985. This audit was evidently undertaken to address the failure of Kenington's early 1980's management to maintain exemption certificates representing that sales of thoroughbred yearlings to out-of-state buyers were not subject to sales tax, according to KRS 139.531. Available records documenting the sales in question, however, reflected that, in terms of total value, 88% of the purchases were made by buyers listing out-of-state addresses, thus indicating a substantial likelihood that most of the sales were never subject to taxation in the first instance.

As the relevant exemption certificates were unavailable in Kenington's files, the Revenue Cabinet, on January 18, 1988, assessed Kenington $75,589.85, plus interest and penalty, pursuant to KRS 131.110(1).

Kenington's accountant filed a protest of the assessment on February 16, 1988,[1]

---

1. Kenington's protest letter reads as follows: "The above taxpayer protests the alleged deficiency in sales taxes as set forth in the above notices which were received under your date of January 18, 1988. Since the inception of the period covered by this audit, the taxpayer's office has moved four times, and management has changed twice with the original management now again being in control. When this audit began, present management was not in control of the corporation and was unable to participate in attempting to locate the records to reputiate

[sic] the allegations in the audit. Present management now is again in control and is attempting to obtain duplicates of records which were lost or misplaced due to the moves by the corporation over the several years since the inception date of the audit period in 1982. Present management is contacting individuals mentioned to obtain duplicates of sales tax, exemptions, etc. For this reason the taxpayer protests these assessments and requests a hearing to resolve the discrepancies."

which described *inter alia* Kenington's turbulent corporate history. The Revenue Cabinet responded to the February protest by granting Kenington an extension of time to submit supporting statements. On June 14, 1988, Joe Johnson, who had resumed Kenington's presidency, submitted to the Revenue Cabinet proof of six sales to out-of-state buyers and requested more time to continue the laborious task of tracking down the far-flung purchasers.[2] Additional correspondence was sent from Kenington to the Revenue Cabinet on July 25, 1988, resulting in the granting of an additional extension of time until August 29, 1988.

In a letter dated September 22, 1988, described by the Revenue Cabinet as an "Eagle Machine Letter," [3] Kenington was informed that the tax bills on the six sales regarding which Johnson had obtained documentation had been voided. The letter also indicated that the Kenington matter had been forwarded to the Collections Division for "appropriate administrative action."

The September 22, 1988, letter did not indicate that it was a final ruling by the Revenue Cabinet on the Kenington matter; it did not recount the issues in controversy, nor the Revenue Cabinet's position regarding those issues; and it did not advise Kenington of its right to prosecute an appeal to the Kentucky Board of Tax Appeals if it disputed the assessment.

Counsel for Kenington's present owners submit that the corporation's records reflect no further correspondence with the Revenue Cabinet after the extension of time to August 29, 1988, was granted in July, 1988. Counsel aver that they first saw the September 22, 1988, letter on May 3, 1990, several months after the Revenue Cabinet had filed the present action.

Whatever the case, on July 28, 1989, the Revenue Cabinet initiated the present action in Franklin Circuit Court to recover judgment against Kenington for the outstanding sales tax, interest and penalties. Kenington's present owners acquired the company one month before the action was filed.

Kenington answered the Cabinet's complaint on August 28, 1989. Kenington's new owners thereafter met to agree upon procedures to obtain exemption certificates to rebut the tax liability. Although Kenington was subsequently informed by the Revenue Cabinet that no further negotiations would occur, it nevertheless undertook to gather documentation to demonstrate that certain sales were exempt from taxation.

The Revenue Cabinet filed a motion for summary judgment and for a permanent injunction against Kenington in March, 1990. The parties exchanged responses and replies until June 27th of that year, when Kenington filed its own motion for summary judgment. Kenington supported its motion with documentation revealing that an additional twenty-five sales were not subject to taxation.

On August 1, 1990, the circuit court granted Kenington's motion for summary judgment on the ground that the Revenue Cabinet had failed its duty to supply the taxpayer with a "final ruling" as required by KRS 131.110(3). When the Revenue Cabinet's motion to alter, amend or vacate

---

**2.** The June 14, 1988, letter reads: "Please find enclosed the statements received by Kenington Sales Company regarding the above sales tax issue. You will also find a copy of a letter from the sales manager during the period in question. Kenington very much needs additional time to get signed statements from the remaining purchasers. We had all those signed tax waivers prior to moving our offices and it is a very hard job to get them signed again."

**3.** The Cabinet's September 22, 1988, "Eagle Machine Letter" reads as follows: "Enclosed please find copies of adjusted audit schedules which reflect a revised assessment of $75,589.85 (plus applicable interest and penalty). The adjustments are based on the information previously submitted. The Cabinet has granted your company numerous extensions to submit the supporting statement as required by KRS 131.110. As of this date, the supporting statement has not been submitted. Therefore, in accordance with the case styled *Eagle Machine vs. Revenue Cabinet* [*infra*] your outstanding sales and use tax audit liability has been forwarded to the Division of Collections for appropriate administrative action."

the judgment was unsuccessful, this appeal followed.

KRS 131.110(1) establishes the procedure by which a taxpayer may protest a tax assessment:

The Revenue Cabinet shall mail to the taxpayer a notice of any tax assessed by it. The assessment shall be final if not protested in writing to the cabinet within forty-five (45) days from the date of notice. The protest shall be accompanied by a supporting statement setting forth the grounds upon which the protest is made. Upon written request, the cabinet may extend the time for filing the supporting statement if it appears the delay is necessary and unavoidable. The refusal of the extension may be reviewed in the same manner as a protested assessment.

The burden to go forward with the evidence is clearly shifted to the taxpayer at the time the assessment is issued. *Hahn v. Allphin*, Ky., 282 S.W.2d 824, 825 (1955). The "supporting statement" mandated by the statute must accordingly be more than a mere denial of tax liability. "[A] taxpayer has an obligation to provide financial statements, records or some other documentation that would allow the Revenue Department [now Revenue Cabinet] some basis for reconsideration." *Eagle Machine Co. v. Commonwealth*, Ky.App., 698 S.W.2d 528, 529 (1985). Then, according to KRS 131.110(3):

After considering the taxpayer's protest, including any matters presented at the final conference, the cabinet shall issue a final ruling on any matter still in controversy, which shall be mailed to the taxpayer. The ruling shall state that it is a *final ruling of the cabinet, generally state the issues in controversy*, the cabinet's position thereon and set forth the procedure for prosecuting an appeal to the Kentucky Board of Tax Appeals.

The Revenue Cabinet contends that Kenington did not succeed in perfecting a protest under KRS 131.110(1) because it failed to timely supply certificates documenting out-of-state horse sales obtained by Kenington subsequent to September 22, 1988, the date on which the Cabinet issued its "Eagle Machine Letter."

The Revenue Cabinet endeavors to define its "Eagle Machine Letter" by distinguishing it from a "final ruling letter." The Cabinet notes that a final ruling letter was issued in *Scotty's Construction Co. v. Commonwealth*, Ky.App., 779 S.W.2d 234 (1989). The Cabinet submits that:

The difference between a "final ruling letter" and an "Eagle Machine Letter" is the former states a controversy and the latter holds that no evidence was produced to create a controversy so collection efforts will soon begin.

The Revenue Cabinet notes that KRS 131.110(3) requires a final ruling letter to address *"any matter still in controversy"* (Cabinet's emphasis). It submits that Kenington has failed to place the issue of certain horse sales to out-of-state buyers (those regarding which exemption certificates had not been obtained as of September 22, 1988) "in controversy," inasmuch as the certificates had not been obtained as of that date. The Cabinet acknowledges that it had eliminated the tax due on the horse sales regarding which it had received exemption certificates prior to September 22, 1988. Kenington, however, had averred that a substantial number of the horse sales regarding which the tax had been assessed had been made to out-of-state buyers, and had in fact substantiated this averment by beginning the submission of the exemption certificates. The Cabinet, however, contends that the sales regarding which Kenington had not by September 22 managed to obtain certificates were not "in controversy." By taking this position, the Cabinet is effectively contending that the only way Kenington could place the issue of tax exempt horse sales "in controversy" would be by summarily eliminating the tax assessed against it on those sales.

KRS 139.531, detailing the application of taxes to horse sales, states that:

(2) The taxes imposed under the provisions of this chapter *shall not* apply to the sale or use of:

(c) Horses less than two (2) years of age at the time of sale, provided the sale is

made to a nonresident of Kentucky, and the horse is transported out of the state, either immediately following the sale or immediately following training within the state if the horse is kept temporarily within the state for training purposes following the sale. (Emphasis supplied.) When Kenington submitted the pre-September 22 exemption certificates to the Cabinet, under the language of KRS 139.531 it did not place those sales "in controversy"—absent fraud, it disposed of the controversy. We accordingly fail to see how the *Eagle Machine* standard for perfecting a protest could be construed to hold that a taxpayer must eliminate the tax assessed against it to place the matter "in controversy."

Kenington did not simply deny that it owed the tax assessed against it, but rather indicated that the horse sales in question had been made to out-of-state buyers; indicated that it had earlier possessed the exemption certificates memorializing this fact, but that those certificates had been misplaced through the company's many moves and changes of ownership; indicated that it would begin the laborious task of obtaining duplicates of the exemption certificates; *and had in fact begun to submit the duplicate certificates to the Cabinet.* Under the *Eagle Machine* standard required for perfecting a protest, we do not see how this response by Kenington failed to place the issue of the horse sales *in toto* "in controversy" for purposes of KRS 131.110(3).

The necessary consequence of the Cabinet's position is manifest, and disturbing: Had Kenington submitted reams of documentation corroborating its contention that 88% of the horse sales in question were made to out-of-state purchasers, and undertaken to submit the certificates to the Cabinet verifying this contention and in fact eliminating the tax—the Cabinet could at any time issue an "Eagle Machine Letter" (thereby avoiding all the notification requirements of KRS 131.110), refuse to accept additional certificates, and go into circuit court in an attempt to seize the taxpayer's possessions. We cannot and do not believe that *Eagle Machine* sanctions this kind of arbitrary behavior on the part of the Cabinet.

■ We agree with the Cabinet that the *Eagle Machine* case holds that more than a mere denial of tax liability is necessary to satisfy the "supporting statement" requirement and perfect a protest under KRS 131.110(1). We agree that KRS 131.110(3) has as its referent the perfection requirement of KRS 131.110(1) when it speaks of matters "in controversy" when mandating the issuance of a final ruling letter. And we agree that a final ruling letter need not be issued when a taxpayer offers essentially no evidence in support of its denial of tax liability, as was the case with the taxpayer in *Eagle Machine.*

■ We however emphatically do not agree that a taxpayer must submit documentation which under statute summarily eliminates the tax assessed against it in order to place the matter "in controversy." Nor do we agree that the Cabinet has the arbitrary authority to at any time determine that a taxpayer, who has in a good faith manner begun the submission of evidence, has in fact supplied a quanta of evidence insufficient to perfect a protest and to place a matter "in controversy," and thereupon to issue an "Eagle Machine Letter" (1) which does not advise the taxpayer of the finality of the Cabinet's ruling; (2) which does not let the taxpayer know that no additional documentation will be accepted by the Cabinet; (3) which does not state the pertinent issues and the Cabinet's position thereon; and, perhaps most egregiously on a practical level, (4) which does not notify the taxpayer of the procedure for undertaking an appeal to the Kentucky Board of Tax Appeals—all the things required of the Cabinet by KRS 131.110(3). When a taxpayer has begun the submission of material evidence substantiating its protest, it is not reasonable that the Cabinet should be allowed to terminate that submission process without giving the taxpayer the statutorily mandated notice regarding the disposition of its case.

■ Under KRS 131.110(3), those matters "still in controversy" at the time a

final ruling letter is issued are matters which the taxpayer has not managed to successfully rebut when, under the standard of *Eagle Machine*, the taxpayer has endeavored to do so. While it is true that a tax assessment by the Cabinet has *prima facie* validity which a taxpayer is obliged to rebut, *Hahn v. Allphin, supra,* the presumptions in favor of the Revenue Cabinet cannot overcome its statutory duty to give a taxpayer fair notice of the disposition of its case, when the taxpayer has endeavored to comply with the *Eagle Machine* protest perfection standard and do substantially more than simply deny its liability on the tax assessment.

■ The Revenue Cabinet has intimated that upon receipt of the "Eagle Machine Letter" Kenington should have pursued an "administrative remedy," perhaps indicating that an appeal to the Kentucky Board of Tax Appeals under KRS 131.110(5) would have been appropriate. KRS 131.-110(5) provides:

> After a final ruling has been issued, the taxpayer may appeal to the Kentucky Board of Tax appeals pursuant to the provisions of KRS 131.340.

Presumably, the Cabinet poses the "Eagle Machine Letter" as representing a "final" determination of the Kenington matter. It is clear however that the letter gave no indication of any sort of final disposition to the matter. Without the finality language of KRS 131.110(3) distinctly displayed, the taxpayer had no reason to believe that an appeal under KRS 131.340 was warranted, or even permissible. Having not been advised by the Cabinet of the procedure for prosecuting an appeal, after the September 22, 1988, mailing Kenington continued the painstaking task of gathering exemption certificates to be submitted to the Cabinet. Given the failure of the Cabinet to comply with the statutory mandate, Kenington

cannot be faulted for continuing its good faith effort to rebut the tax assessment.[4]

The judgment is affirmed.

All concur.

---

**4.** In the recent case of *Revenue Cabinet v. Castleton, Inc.,* Ky.App., 826 S.W.2d 334, 336 (1992), we discuss the finality issue at length. The following language from that opinion is instructive: "[KRS 131.110(1), (3) and (5) clearly indicate] that after a protest to a tax assessment has been made by a taxpayer, the Cabinet shall issue a final ruling or determination on the matter. It is only when such ruling is final—and so states—that it can be appealed to the Board of Tax Appeals."